**Charles H. MANASCO**

v.

**Acting Administrator Grace ROGERS; Glen Ferguson Clinical Director/NRU; Al Compoly Assistant Director/NRU; LT. Gonzalez C/O NRU; Officer Miller C/O NRU**

**Keith Miller, Appellant No. 06–4300.**

**Charles H. Manasco, Appellant No. 07–1892**

v.

**Acting Administrator Grace Rogers; Glen Ferguson Clinical Director/NRU; AL Compoly Assistant Director/NRU; LT. Gonzalez C/O NRU; Officer Keith Miller C/O NRU.**

**Nos. 06–4300, 07–1892.**

United States Court of Appeals, Third Circuit.

Argued: July 21, 2008.

Opinion filed: July 29, 2009.

Ann Milgram, Esq., Attorney General of New Jersey, Lisa A. Puglisi, Esq., David L. DaCosta, Esq., Deputy Attorneys General, Mary E. Wood, Esq. (Argued) Assistant Attorneys General, Richard J. Hughes Justice Complex, Trenton, NJ, for Appellant/Cross–Appellees.

Lawrence S. Lustberg, Esq., Emily B. Goldberg, Esq., Avidan Y. Cover, Esq. (Argued) Gibbons, P.C., Newark, NJ, for Appellee/Cross–Appellant.

Before: McKEE, FUENTES and JORDAN, Circuit Judges.

OPINION

McKEE, Circuit Judge.

Keith Miller, a Correctional Officer ("CO") employed by the New Jersey Department of Corrections ("NJDOC"), appeals an order of the district court denying his motion for summary judgment on the basis of qualified . immunity. Charles H. Manasco, who has been civilly committed under the laws of New Jersey, cross-appeals from the district court's order granting summary judgment to Grace Rogers and Lt. Gonzalez, employees of NJDOC, and Glenn Ferguson and Al Compoly, employees of the New Jersey Department of Health Services ("NJDHS"), on the basis of qualified immunity. For the reasons that follow, we will vacate the district court's order as to Miller and Gonzalez, vacate with respect to Ferguson and Compoly as to Manasco's medical care claims only, and affirm the district court's order in all other respects.

## I. BACKGROUND

In 2000, Manasco was civilly committed pursuant to the New Jersey Sexually Violent Predator Act. Since then, he has been detained in the Special Treatment Unit ("STU") in Kearney, New Jersey. Manasco alleges that on February 1, 2001, he saw Miller escorting another STU resident from the housing unit, and that Miller was treating the resident inappropriately. According to Manasco, as Miller passed, Manasco said: "Why don't you leave this man alone? ... Why don't you go back to where you're supposed to be working?" Manasco claims that Miller reacted hostilely, shoving his finger in Manasco's face and saying: "Shut the fuck up Manasco," and calling Manasco a "pussy mother fucker from Avenal." Manasco claims he re-

sponded by telling Miller to "take your finger out of my fucking face."

Pursuant to DOC procedure, Miller wrote a report detailing the incident. Miller's report states that Manasco threatened him by using inappropriate language directed at him in an "angry, aggressive and hostile manner." Manasco contends that Miller's report was false. Shortly after the incident involving Miller and Manasco, Correctional Officer Qualls, who is not a defendant, placed Manasco in handcuffs and escorted him to the medical unit for clearance to place him in a Restricted Activities Program ("RAP") unit. Manasco claims he was strip-searched in the process. Qualls notified defendant Lt. Gonzalez of Manasco's placement. Soon after Manasco's placement in RAP, Manasco observed another officer tell Qualls that Gonzalez had instructed that Manasco was to "get nothing" while in the RAP unit.

Manasco claims to have several chronic illnesses including anxiety and a medical condition that results in seizures that are brought on by stress. These conditions, he contends, rendered his continued placement in RAP inappropriate and dangerous. In fact, Manasco contends that within minutes of being placed in the RAP unit, he suffered a seizure—largely because of the stress of the situation. According to him, another STU resident walked by his room and saw that Manasco was on the floor having a seizure. The resident was not able to enter the locked room and could only watch as Manasco seized and banged his head repeatedly on the toilet, causing his head to bleed.

During or after this seizure, Manasco lost control of his bladder and soiled his clothing. At some point thereafter, he asked a CO for clean clothes, but the CO ignored him. Manasco claims that this denial was because of Gonzalez's order that he "get nothing" while in RAP. Manasco claims to have had at least one additional seizure, on February 3, which also caused him to urinate on himself. However, he was not provided a change of clothing or an opportunity to bathe until he saw the treatment team on February 5.

Manasco argues that prison officials knew of his medical and mental health issues, but nonetheless failed to assess his capacity to withstand detention in the RAP unit. Manasco claims that he was never afforded any of the procedural safeguards required under the policies applicable to detention in the RAP unit. Although the policies require that a RAP team meet with a resident within 24 hours of confinement in the RAP unit—in order to assess the assignment and provide an opportunity to communicate with treatment personnel—Manasco's RAP team purportedly did not meet with him until four days after he was confined in the RAP unit, did not give him an opportunity to challenge Miller's "false charges," did not conduct any investigation, and simply assumed that Manasco was lying. Although RAP is intended as a form of therapeutic intervention, Manasco claims it was used to punish him because he was never provided with any therapeutic treatment during his confinement in the RAP unit.

Manasco filed this action pursuant to 42 U.S.C. § 1983, challenging the constitutionality of his placement and detention in the RAP unit. Eventually, defendants all moved for summary judgment on the basis of qualified immunity. The district court denied Miller's claim for summary judgment based on qualified immunity because the court believed that claim turned on disputed factual issues—Miller's motivation for placing Manasco in RAP and the veracity of his disciplinary report. The district court granted each of the other defendants' motions because the record contained no evidence that they were

aware of Manasco's seizures or that he had soiled himself. These appeals and cross-appeals followed.

## II. STANDARD OF REVIEW

We review a district court's decision to grant summary judgment *de novo,* and we apply the same standard the district court should have applied in determining whether summary judgment was appropriate. *State Auto Prop. & Cas. Ins. Co. v. Pro Design, P.C.,* 566 F.3d 86, 89 (3d Cir.2009). We must review the evidence in the light most favorable to the non-movant and determine whether genuine issues of material fact exist for trial, or whether the movant was entitled to judgment as a matter of law. *See Busch v. Marple Newtown School Dist.,* 567 F.3d 89, 95 n. 7 (3d Cir.2009).

## III. ANALYSIS

### A. Miller's appeal

■ Miller contends that the district court erred in denying his motion for summary judgment on the basis of qualified immunity. However, at oral argument, counsel for Manasco conceded that Manasco's own experts had testified that Manasco's initial placement in the RAP unit was proper even under Manasco's own version of his confrontation with Miller. Since Manasco also acknowledged that his claim against Miller is based only on his initial placement in the RAP unit, he has clearly abandoned any claim he may have had against Miller based on that placement. We will therefore vacate the order of the district court insofar as it denied Miller qualified immunity.

### B. Manasco's Appeal

Manasco contends that the district court erred in granting summary judgment in favor Rogers, Compoly, Ferguson and Gonzalez on the basis of qualified immunity. He claims that the court should have separately determined whether he raised genuine issues of material fact for each claim against each defendant rather than awarding them "blanket" qualified immunity.

The doctrine of qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). Qualified immunity is intended as a shield against the burdens of litigation as well as liability. *Walter v. Pike County, Pa.,* 544 F.3d 182, 190 (3d Cir.2008). In assessing whether qualified immunity is warranted, the court must determine whether "the plaintiff has alleged a deprivation of a constitutional right," and whether the right at issue was "clearly established" at the time of the defendant's alleged misconduct. *Pearson v. Callahan,* — U.S. —, 129 S.Ct. 808, 816, 172 L.Ed.2d 565 (2009). The court may address these prongs in either order. *Id.* at 818. "If an official could have reasonably believed that his or her actions were lawful, the official receives qualified immunity even if in fact the actions were unlawful." *Forbes v. Twp. of Lower Merion,* 313 F.3d 144, 148 (3d Cir.2002).

#### 1. Due process claim against Rogers, Ferguson and Compoly

■ In his briefs, Manasco contends that Rogers, Ferguson and Compoly deprived him of post-confinement due process by denying him both an explanation of the reasons for his placement in RAP and an opportunity to challenge the allegedly false charges made by Miller, and failing to conduct any investigation into the truth

of Miller's allegations. Manasco also contends that Rogers failed to respond to a letter he sent her seeking vindication after he was released from the RAP unit. However, as we noted above, Manasco has abandoned his challenge to his initial placement. He concedes that the initial placement was proper even assuming his version of events. As a result, he cannot assert a claim that he was wrongfully denied an opportunity to contest this admittedly proper placement. Therefore, Manasco's procedural due process claim against Rogers, Ferguson and Compoly must fail.

## 2. Policymaker claims against Rogers, Ferguson and Compoly

■ Manasco also claims that Rogers, Ferguson and Compoly were administrators and professionals in a policymaking position, and that they failed to implement a policy for adequate treatment and assessment of potential medical and psychiatric needs of individuals detained in the RAP unit. We have acknowledged a civil detainee's constitutional right to a policy ensuring adequate health care. *See A.M. v. Luzerne County Juvenile Det. Ctr.,* 372 F.3d 572 (3d Cir.2004). However, *A.M.* was not decided until several years after Manasco's detention in the RAP unit. Therefore, we cannot conclude that that requirement was established law when Manasco was confined. The law does not require the defendants to foresee or predict our holding in *A.M.,* and we therefore conclude that Rogers, Ferguson and Compoly are entitled to qualified immunity on claims brought against them as policymakers.

## 3. Medical care claims against Ferguson and Compoly

■ Manasco next asserts that Ferguson and Compoly denied him due process by failing to provide him with adequate health care or any therapy during his confinement in the RAP unit. He asserts that they knew or should have known of his medical history and the likelihood that stress would aggravate his seizure disorder, yet they did nothing to assist him when he began having seizures, and that they deliberately aggravated his circumstances. The district court concluded that neither Ferguson nor Compoly had any knowledge of Manasco's problems in the RAP unit and that, absent their personal involvement, they could not be held liable.

Resolution of this claim turns on a two-prong inquiry. We must determine whether the alleged conduct violated a constitutional right. If it did, we must determine if that right was clearly established when the conduct occurred. *Pearson,* 129 S.Ct. at 816. A civilly committed person has the right to adequate medical care in detention, and that right was clearly established long before Manasco was placed in the RAP unit. *See Youngberg v. Romeo,* 457 U.S. 307, 317, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982) ("When a person is institutionalized-and wholly dependent on the State ... a duty to provide certain services and care does exist....").

Here, Manasco proffered sufficient evidence to allow a reasonable factfinder to conclude that defendants were aware or should have been aware of his clinical history, and that although they were responsible for providing medical treatment to RAP detainees, they failed to do so in his case. Manasco testified that he saw Compoly fleetingly on his first day in RAP, but that no one from the RAP team checked on him from February 1st to the 5th, despite the RAP policy requiring the treatment team to meet with someone confined in the RAP unit within 24 hours of the detention. Manasco argues that even if Ferguson and Compoly were unaware of

his psychiatric and medical needs, they were on notice that he had suffered a seizure in the RAP unit, and yet they did nothing to ensure adequate treatment.

Ferguson and Compoly dispute Manasco's version of the facts. They assert that Compoly met with Manasco on February 1st, and that Manasco was not ignored by the RAP team for four days as he contends. They claim that they neither knew nor had reason to know that Manasco had soiled himself or that he had not received adequate medical or psychiatric care.

These factual disputes preclude summary judgment on the issue of qualified immunity because they are crucial to determining whether Compoly and Ferguson violated the duty they owed Manasco under *Youngberg*. Accordingly, we must vacate the district court's order granting those two defendants summary judgment on their claim of qualified immunity.

### 4. Hygiene claim against Gonzalez

■ Finally, Manasco asserts that Gonzalez violated his right to due process by instructing officers on the RAP unit that Manasco was to "get nothing." Manasco claims that this caused an unnamed officer to deny Manasco a change of clothes after his first seizure. As a result, Manasco contends, he remained locked in a room in soiled clothing for four days. The district court concluded that the record did not support Manasco's claim that Gonzalez was aware that Manasco had soiled his clothing. Accordingly, the district court concluded that Gonzalez was entitled to qualified immunity.

The Constitution requires the state to provide adequate hygiene and sanitation for persons in its custody. *See LaReau v. MacDougall*, 473 F.2d 974, 978 (2d Cir. 1972) ("Causing a man to live, eat and perhaps sleep in close confines with his own human waste is too debasing and de-

grading to be permitted."). This right to adequate hygiene and sanitation was clearly established when Manasco was detained in the RAP unit. We believe that there is sufficient evidence on this record to allow a factfinder to conclude that Gonzalez violated this right.

Manasco does not claim that Gonzalez knew that he had soiled his clothes while in the RAP unit. Rather, Manasco testified that he lip-read one officer tell another that Gonzalez had instructed them to give Manasco "nothing" while confined in the RAP unit. This evidence, if believed, is ambiguous. A reasonable jury could conclude that Gonzalez was merely describing the austere conditions accompanying confinement in the RAP unit (no privileges), in which case, there would be no liability. However, a jury could also conclude that Gonzalez was being vindictive and that he intended to teach Manasco "a lesson," by ordering that he get nothing— not even a change of soiled clothing. If a jury were to conclude the latter, Gonzalez's conduct could violate due process, regardless of whether he knew that Manasco required a change of clothes because he had soiled himself. Given that ambiguity and the resulting issue of material fact, the district court's grant of summary judgment based on qualified immunity on this claim was erroneous, and must be vacated.

We realize, of course, that the admissibility of the evidence of the "lip-read statement" is a legal issue that must be resolved. Under Rule 104(a) of the Federal Rules of Evidence, it is for the district judge to decide whether there is any foundation at all for Manasco's claim that he has the ability to read lips and hence is competent to testify as to the meaning of lip movements he claims to have observed. It is also possible that this evidence would be barred by the hearsay rule. However, those determinations can best be made

after the parties have had an opportunity to introduce more evidence of the circumstances surrounding the "statement" and of Manasco's competence to testify as a lip-reader. Accordingly, we think it best to allow the district court to resolve the issue of the admissibility of that evidence in the first instance, on a more developed record.

### IV. Conclusion.

For the reasons discussed above, the district court's order will be vacated with respect to Miller and Gonzalez, vacated with respect to Ferguson and Compoly as to Manasco's medical care claims only, and affirmed in all other respects and the matter remanded for proceedings consistent with this opinion.